Case number 14-1646, 1660, 1672, and 1672 United States of America v. Mustafa Al-Din Walee Al-Din Charles Lewis and Ralphael Crenshaw respectively. For our next couple of minutes, we'll share our defendants for a minute to explain them. And then we'll turn to see where you found Ralphael Crenshaw. Good morning. Good morning, Your Honors. May it please the Court. This is Melissa Salinas. I'm supervising attorney in this case. And Jake Byrne is a law student in the University of Michigan Federal Appellate Litigation Clinic, and I will be supervising his performance today. Thank you. Have counsel decided how to split the time? Are we splitting it evenly among the four? Yes, Your Honor. Okay. And are you aware of that? Each year you're going to take it along. Seven minutes or something? Eight minutes each. Eight minutes each. Okay. Very well. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Jake Byrne for the appellant, Mr. Ralphael Crenshaw. I would like to reserve two minutes for rebuttal. Very well. This case is about a conspiracy that never existed. After failing in state court to convict those charged with the murder of a young woman, the government wanted to make sure that it would convict in federal court. To maximize its chances, the government framed the death not as the terrible result of an isolated incident, but as one of the many harmful outcomes of a widespread drug conspiracy. But the evidence presented at trial does not support a finding that such a conspiracy existed. Mr. Crenshaw's variance argument and his severance argument speak to this inconsistency. Starting with the variance argument. A variance occurred in this case because although the government charged Mr. Crenshaw with participation in a widespread drug conspiracy, the evidence at trial can reasonably only be construed as finding that three independent acts occurred. An attempted kidnapping, a revenge plot, and a home invasion. This variance substantially influenced the outcome of the trial because it caused Mr. Crenshaw to be convicted on evidence unrelated to his own alleged activity. For this reason, count one of Mr. Crenshaw's conviction should be reversed and remanded to the district court for retrial. In this case, the government charged the widespread drug conspiracy, and in that conspiracy it attached three distinct acts. This court has said in United States v. Smith that in order to establish the existence of a widespread conspiracy, the government must show that common participants pursued a common goal according to a common scheme. But in this case, none of the evidence presented at trial establishes that a common goal was shared by the participants in each act, and none of the evidence shows that there was a common scheme. Beginning with the common goal... The theory of the government is that it was a drug conspiracy, right? Basically. Yes, Your Honor. And all these guys conspired to distribute drugs and to make what they call licks, robbing people. That's their theory? Yes, Your Honor. I mean, the goal of the block burners was to get money by selling drugs and doing licks. I mean, that's the common goal, isn't it? Well, and the common method was to steal drugs and money from other drug dealers and people who were unlikely to go to the police and complain about what had happened. They were easy marks. They were licks. Yes, Your Honor. They were easy marks. Isn't that at least a common method of operation there that could be seen as part of a global conspiracy? It depends, Your Honor. If you're willing to look at it in a very broad view, then possibly you could construe that as a scheme. But if you look to the actual crimes that were committed, the three distinct acts, the common goal... There was no common goal and there was no common scheme. If you look, focusing on common scheme, if you look to the Batchelor home invasion, that was planned by a man named Haitian P. who is not associated with any other member of the group. And he was given information by his girlfriend that a man, Mr. Batchelor, possessed a certain quantity of medical marijuana. So he called three of his friends and decided to obtain that marijuana. If you look to the Tyrese Jones robbery, on the other hand, the drugs that they obtained were only a secondary benefit. When you talk to Charles Lewis Sr., he stated that the reason that they robbed Tyrese Jones was because they wanted to get revenge. Charles Lewis Sr. was angry at Mr. Jones for refusing to pick up his son after his son ran away from a juvenile halfway house. And the two participants, Mr. Klein and Mr. Brown, they took part because they were mad that Mr. Jones did not allow them to take part in his broader drug dispute. But again, this is somebody who they knew had drugs and guns and stuff on the premises who was unlikely to report them to the police. Even though he knew who they were when they came in to rob him. That is true, Your Honor. And if you look to the final act, the attempted kidnapping, that scheme is much more complicated than the previous two. That was not a simple find a vulnerable victim and go after them right away. That was a nine-member act that was carefully planned and each was given a distinct role. And if you looked at all three, the schemes are just different. They are not a cut-and-paste type of attack. The common goal aspect of the United States v. Smith is the most important factor to consider in this case, though, Your Honor. Because in each case, someone distinct, someone not part of this block-burner group came up with a plan. And the goal was to obtain personal wealth from the drugs and other items that were stolen. There is no evidence that the, though all involved attempts to get drugs, there is no evidence that presented a trial that shows that these were attempts to get drugs as part of a single enterprise. What exactly did the district court do wrong here? We're reviewing the instructions and various things that happened in the district court. And what is it that you're claiming the district court erred about? The district court erred, Your Honor, in the fact that although the indictment charged a single widespread conspiracy, the facts that were presented at trial proved evidence that was materially different than what was alleged. And a motion was made at what point in time and was overruled or something? I mean, he instructed the jury about conspiracy law. I'm just wondering what it is he did wrong when. I see my time has expired my answer to your question, Your Honor. No motion was made at trial, Your Honor. That is true. And that is why we are proceeding under a plain error standard. All right. Any further questions at this time for Mr. Byrne? All right. You'll have your two minutes rebuttal, Mr. Byrne. Thank you very much. Let's hear from the next defense counsel. Good morning. May it please the court. My name is Travis Rossman. I represent Appellant Mustafa al-Din. And I would like to reserve two minutes for rebuttal, please. The first issue I'd like to discuss is that the district court erred by denying Mustafa's motion to suppress. The government, on appeal and in its supplemental citation to authority, has tried to create an issue about whether Mustafa unequivocally asserted his right to counsel. And he did. He said, man, I want to talk to my lawyer. Okay. Even if we agreed with you that the district court should have suppressed the statement, is the error here, or tell me why the error is not harmless beyond a reasonable doubt in view of all the other testimony which is consistent with the statement that was allegedly made in violation of his right to counsel? The district court's error is highly prejudicial for several reasons. First of all, there's limited harmless error review for a coerced confession. Arizona versus Fulminante, the Supreme Court said that whenever a statement is coerced, it is inherently unreliable. Well, wait a minute. There wasn't a coercion claim here. I thought there was, in effect, an Edwards claim going back to the Miranda warnings. Denial of right of counsel, Sixth Amendment violation. No, Your Honor, it would be the Fifth Amendment. The Fifth Amendment, which was at issue in Miranda, says, you know, whenever you have an assertion of the right to counsel during a custodial interrogation, counsel has to be provided. Questioning has to cease. That's Miranda and Edwards. The Sixth Amendment only attaches at critical stages. He was arrested on Saturday. This was questioning on Sunday. He hadn't been arraigned yet or anything else. So the Sixth Amendment right I don't think would have attached yet. The judge's question was why not harmless error? The evidence, assuming for the moment that there was a violation of Edwards and Miranda in that line of cases, why isn't the overwhelming evidence, why isn't there overwhelming evidence that would make that error harmless? Okay. So when Mustafa was first arrested, he gave a statement to Detective Kim Cranch. You actually know the facts. Right. Just answer the question. Okay. So Mustafa's statement up to the point where he had asserted his right to counsel was pretty much exculpatory. He said these people came in my house. They tied me up. At that point he had a mere presence defense. I was present while other people did these things. They came to my house after the lick. I'm a victim too. He kept saying, please put me in witness protection. I'm afraid for my life. That turns out to be false. It's inconsistent with his statement given later, which we would say is involuntary. So up to the point where he has the cigarette break, his statement has not directly. Okay. So we're going to take all the statement out from the cigarette break on. But then there's all this testimony by witnesses at trial involving what his or testifying to what his involvement was. That's what we're talking about. I mean, there's all sorts of physical evidence. Right. So the physical evidence could be explained by the people actually entering his home and tying him up like he said. The physical evidence could be explained by his exculpatory statement that he had given prior to the cigarette break. So there's an explanation there. The testimony from the defendants who cooperated and ultimately pled guilty, again, that's a pure credibility issue. Well, it is. And that's what the jury had to determine. And it's done. Well, I don't think the jury credited all of their testimony. The jury came back not guilty with respect to some of the counts in the Beechler robbery. So the jury bought part of the story but didn't buy it all. Well, they bought the part that involved your client, though. So that's your problem or his problem, actually. Right, but they bought it because they had this involuntary confession that was brought into evidence after the Edwards initiation or, well, under the theory that there was an Edwards initiation but where there really wasn't. And some of the key facts he admitted after the cigarette break, he said, I gave a little insight to the men who were planting the lick in his home. That takes him from mere presence to being a participant. That takes him from being a victim to a planner. And so that's highly prejudicial. And I don't think we can say beyond a reasonable doubt that the jury, you know, still would have returned a guilty verdict without that evidence. I think that's a very important point. So coming back to the issue of assertion, the government filed a supplemental citation to authority with this case from the Tenth Circuit, United States v. Brown. But there are some important reasons to distinguish that case. I think the most important thing is that in that case the suspect said at the same time, in the same breath, on the same forum, yes, I want an attorney, but yes, I will talk without an attorney. And that was ambiguous. Here he said, man, I want to talk to my lawyer. You're trying to pin this on me. I want this to stop. At that point, all interrogation has to cease. But it didn't. Detective Gill kept going, and he said things that were highly coercive. I'm paraphrasing, but it's not a matter of whether you'll go to prison. The issue is how much time you're going to do. And you can see Mustafa trying to buy time. He's saying, look, just let me have a cigarette break. Let me think about this. Let me think about this. Well, he got one, and then he says, I want to talk to you. Well, he comes back in, and the most important thing to consider, and whether there's an Edwards initiation, is who starts the conversation. And so it's Detective Gill. He says, did you think about your girlfriend, Mustafa? There's no verbal response. I thought the first thing he said was you invoked your right to a lawyer, and do you want to stop talking, or do you want to talk to us, or something like that. Your Honor, I believe from the record, the very first thing he says, did you think about your girlfriend, her name escapes me at the moment, but he kind of nods. He says, yeah. He said, do you think about how long it would be? And he kind of nods. That's when he says, do you want to talk to me without an attorney? And he kind of nods, but there's no verbal response. Didn't he say, I want to talk to you? Didn't he explicitly say? I mean, I'm just talking about what the facts are. Yes, not yes, but I want to talk to you. Right. So after he said, man, I want to talk to a lawyer, the interrogation continues, and during that time he says, I'll talk to you man-to-man outside. Just let me have a break. But in that five minutes after the assertion and before the cigarette break, nothing he says can be an Edwards initiation because it's under the continued influence of the authorities. And that's the whole point of Edwards is to prevent a suspect from relinquishing a right that's been asserted under the influence of the authorities. And I see that my time is up. Thank you. Good morning. Good morning. May it please the Court. My name is Dennis Belli, and I represent Charles Lewis Sr. in this matter. I'm going to argue an issue that is peculiar to Mr. Lewis, and that's our first issue regarding his right to conflict-free counsel. On the day of trial prior to jury voir dire, Mr. O'Hara, counsel for Mr. Lewis, announced that he had looked over the government's witness list that he had just gotten the previous Friday and noticed that one of the government's witnesses was an individual that Mr. O'Hara had represented in state court. He tells the district judge, Your Honor, I'm asking either that the government not call that witness or I would ask that I be removed because I do not feel that I can cross-examine this man because we had a good relationship and I still feel a sense of loyalty to this former client. The prosecutor, U.S. Attorney, announced as well, we can resolve this problem by simply getting a waiver of any privilege from Mr. Kasul. The district judge states, well, we'll deal with this when the witness is called. And eventually the issue comes up again when Mr. Kasul is called as a witness. Before the jury is brought in, there's a voir dire. Mr. Kasul, who seemed awfully eager to testify, the prosecutor asked him, are you willing to waive the privilege? And he was quite eager to do so, unusually eager to do so. In any event, the judge said, okay, well, he waives the privilege. There's no issue here. And the defense counsel says, well, I object. I don't think that solves the problem. Mr. Kasul testifies, and he provides some very damaging testimony against Mr. Lewis. He's aided by a video at the jail. I believe it was a silent video showing a fight between Mr. Lewis and Mr. Crenshaw. And Mr. Kasul is asked, well, what was this fight about? And eventually Mr. Kasul was in jail at the time. Yes, he was. So he states that it started over a girlfriend, but that Mr. Lewis makes this statement, well, after I did her, I should have taken the gun and used it on you guys. And the U.S. attorney, in closing argument, argues, you know, this is an admission that he was the gunman, the guy that killed Shayla Johnson, because why would you admit such a thing if it's not true? Obviously a fairly compelling argument. So this was very damaging testimony, and we would submit that the less than three pages of cross-examination of this witness by Mr. O'Hara was largely ineffectual. I called it a powder puff cross-examination in the brief. And we don't know. There was no development of how Mr. Kasul came to the attention of the government. Did he initiate the desire to testify? There were a couple of questions. Is there a constitutional violation here that you're claiming? That Mr. Lewis was denied his right to an attorney with undivided loyalty to Mr. Lewis. It's actually ineffective assistance of counsel, isn't it? Is that what the claim is? No, that's because under the Strickland test we'd have to show a reasonable probability of a different outcome. No, we're approaching this more from the standpoint that he's denied conflict-free counsel and that the only thing we need to show— What's the name of that Supreme Court case you're relying on? Glasser v. United States. But the conflict privilege belongs to the client. The client waived the privilege, but the attorney wants to assert the privilege anyway. I don't know how the attorney has standing to assert his client's privilege. So I don't know how you get there. So I think all you're left with is that his cross-examination was tempered, or whatever you said, and was not effective, and that goes back to ineffective assistance of counsel. But the conflict, I think, is eliminated by the waiver of the client. I mean, unless it was an invalid waiver. How do you get by that? There's two duties here, the duty to the former client and the duty to the current client. Now, the waiver certainly resolves any issue regarding the privilege as to the former client, but there's still the duty of loyalty to the current client, and defense counsel is saying I can't effectively represent my current client because I still feel a duty of loyalty to the former client, and I can't go after him like I should. I think that's ineffective assistance, and the problem with that is we don't normally decide it on a direct appeal. You have to bring a subsequent proceeding usually for ineffective assistance. Well, certainly that is an issue of first impression, I think, for this court, and we've cited cases from the Second Circuit. In Lucere, the Second Circuit said in a situation like this, the court must secure a waiver not only from the former client but also the current client on trial. And then we've cited a more recent case, U.S. v. Oberoi, where the Court of Appeals granted relief, said that the judge in almost identical circumstances There's a 2255 case here for ineffective assistance of counsel, but I don't quite see that it's something that goes beyond ineffective assistance of counsel. He should have cross-examined him better, you're saying. And you're saying the reason he didn't is because even though his former client had completely waived his privilege, he in his mind still had feelings about the former client, and so he didn't go after the client when he should have. But he's saying on the record that I have a duty to the former client. I cannot represent my current client because— He may have a feeling or an instinct or something, but— See, I don't think he's got a duty as a matter of law, but if he has a feeling that renders him ineffective, well, that's a 2255. So what do you think should have been done at that point? Well, the court should have allowed a defense counsel to withdraw from the case. Oh, goodness. Right there in the middle of that trial? But the issue was raised before the jury was selected, so it could have been addressed at that time. The fact that the judge chose to just delay the decision I don't think should be imputed to Mr. Lewis. But we've cited case law that stands for the proposition that there are the two duties here, so I think it truly is something that can be decided. What was Lewis's sentence? Life. And if I just make one more point regarding this prejudice, that there was a witness who pointed—and I witnessed a neighbor that pointed the finger at this Dion Lanier as the guy that he saw with the gun that was used to murder Shayla Johnson, and he said— But that wasn't the only testimony regarding who the shooter was. That's true, but the other witnesses were—they were promised leniency. So the point I'm making is that we think that Mr. Kasul's testimony was very pivotal in Mr. Lewis being found guilty of the specification of a premeditated killing. All right. Thank you, Mr. Pillai. In the process of elimination, we're down to Mr. Rossman. Oh, no. Scott Graham. Scott Graham. Oh, I'm sorry. And may it please the Court, a few perhaps disjointed comments, but I think the Court obviously understands the record, and this was a lengthy and complicated trial. How long did it take? I think it was a little over a couple of weeks. Not too bad. And there was a question posed of Mr. Rossman regarding why isn't this harmless error regarding Mustafa. Now, I think I would address that because they were tried jointly, and we were harmed by Mustafa's statement that came after the invocation of the right to counsel. This is the reason it's not harmless. In regard to—I mean, we've got to look at this setting. In this setting, we've got four defendants sitting in this courtroom. We've got a pool of prospective jurors that come in, a big pool, two African Americans, a very hostile setting. It's just a tense setting. And the difference is between what Mustafa said and the reason it's not harmless is, in my opinion, the words came from one of the four men sitting at the table. The words came from there. And let me go on and say this. So you're, in effect, arguing the Edwards-Miranda violation that applies to Mustafa and not to Wally? Well, Your Honor, I'm arguing it as it relates to the severance issue. You're talking about Bruton? No, right now I'm saying— No, he's talking about severance. Right now I'm saying that everyone was prejudiced. I don't know what your argument is, but it may be that it should have been severed because there's a Bruton problem. Well, and we've argued that, but I wasn't going to. I think that's been fully briefed in regard to— Wasn't that the basis for the severance or the argument for the severance? It was the basis, but what I'm trying to say is that it wasn't harmless because it was a different type of evidence. The other evidence, testimony from the three testifying co-defendants, Klein, Brown, and Lanier, that was there. But these were all people with a significant motive to falsify. And we know the jury didn't accept the testimony, all of the government's testimony. When there was no statement that came from anyone sitting at that table in regard to the Baechler crime, which was a horrible, horrible home invasion, beating, theft of marijuana, they acquitted my client and Mr. Crenshaw on both of those counts. They acquitted them. This is different. Words were coming from one of the four at the table, and I think that was a point I was going to make regarding why I think it's different. This was a capital case. This case ran the capital protocol. Klein, Brown, and Lanier negotiated sentences in the range of 20 years. They had a significant motive to tell stories that would be consistent with the government. Did they ask for the death penalty in the case? No, it was a death-eligible case that had to run the protocol. When all was said and done, Lewis and Wally made presentations at the DOJ, and then a decision was made not to seek the death penalty. But from what was a case that was going to involve life guidelines, these people are getting in the range of 20 years. So I'm just saying that there was a difference when the words came from Mustafa than when they came from someone else. And this jury certainly did not accept all of the government's witnesses that came forward. I'd like to spend my remaining two minutes on the Batson issue. We know in this case, it's undisputed, again, in comes the jury pool. In this big pool there are two African-Americans. All four of the defendants are African-American. Juror number 61, his name is Mr. Calvert, was subjected to a preemptory challenge by the government. A timely objection was made. The court considered the question of whether or not there was a Batson violation, and in fact. . . Not for cause, it's a preemptory. Yes, Your Honor. The government made an explanation that indicated that it had a low evaluation of Mr. Calvert because of education and because of a hearing problem and perhaps a problem about some concern about racial targeting that was unrelated to this case. Mr. Calvert explained away every one of those concerns. He could hear fine. The record reflects no indication that he can't hear. He was able to answer questions in an intelligent manner. Bottom line is the government offered no reasonable excuse for using a challenge on one of the two African-American. . . Did they not challenge the other one? They did not. You had one African-American on the jury. Correct. So the . . . But this was the fellow who said he didn't think he could even give the American justice system a fair shake. Your Honor, I think he was clearly rehabilitated. He waffled at first. I agree. Well, he was rehabilitated to the satisfaction of the judge who didn't therefore dismiss him for cause. But in terms of a peremptory challenge, put yourself in the shoes of the prosecutor who's looking at somebody who has to be rehabilitated from a position that the whole justice system is unfair. Your Honor, my perspective is that he offered questions about an incident involving the justice system, but it's my recollection he did not say, I could never be fair. He didn't have to be rehabilitated from that. Rehabilitation of him was extremely easy, and I think the court was well satisfied that he was a qualified juror. When all was said and done, the court had to make a decision on factor number three. And I just don't think that the government offered any reason that, objectively speaking, would satisfy that. Thank you. Thank you, Mr. Graham. All right, let's hear from the government. Thank you, Your Honor. Good morning. Good morning. May it please the court, my name is Tim Verhey, and I represent the United States in this case. Like Mr. Graham, I was also trial counsel at the district court proceedings, and I'm sure the court is aware that there are 17 issues in this case, and I'm going to do my best to try and identify the ones that you may have concerns about, but if there's something that hasn't been addressed. This issue hasn't been brought up. I don't really quite understand the Bruton problem in the case. It does seem to be one, but it may be not. Would you just tell me the fact? You're going to have to argue a little on their side too, but tell me what the facts are, the controversy about the Bruton problem. Okay. When Mustafa al-Din ultimately made a statement to Detective Gill, and that gets into the Miranda issue a little bit, let's assume for the sake of argument that it was admitted properly. He ends up telling the police, Detective Gill, that the group of people that came over included Dion Lanier, Brown, I think that's right. Those two wouldn't matter because they ended up pleading guilty and were witnesses and weren't implicated in a Bruton issue. But then he says, there were other friends of my brother, Wally al-Din, who was Mr. Graham's client. And then he just says there were a group of them. I think he says five or six. So the specific Bruton problem that we had to address, if we wanted to use the statement, was to get away from Wally al-Din. And what Judge Yonker told us to do is just redact it to say it was Dion and a group of people I don't know, which is what the jury heard from Detective Kranich, who took a statement before the Gill statement. And Gill's statement was Dion and a group of other people. Was the other people, the identity of the other people, sufficiently clear from the other testimony in the case so that the jury would have tied the other defendants in the case who were part of the group that he was talking about so that there was a serious corroboration problem, which would be a Bruton problem? That would be the argument between the parties. We would say that it appears to us that the circuit law is clear that if you have to go elsewhere to connect the identities of those people to the statement, then there's no Bruton problem because the other evidence was necessary. Some parties have said, well, you know, in circuits like the Third Circuit or other circuits, it becomes so, if the redaction is so clumsy or obvious. It's pretty clear who they're talking about. If it is, yeah. Now in our case, I would say factually, the redaction actually threw a red herring in front of the jury because the jury was left with the impression that Mustafa said, these people, I didn't know them except for Dion. Well, the evidence is it was his brother and the people that he hangs around with every day. So if anything, we made things more difficult for ourselves. The jury would have been misled about who it was. Correct. That's what we think.  So that's what the issue is. As far as the issues that have been raised today, let me just go through our response to some of those. Starting with the Miranda issue, which involves Mustafa al-Din, I hear from your questions that It's era. It looks pretty clearly like era, but the question is, what's the effect of it? Okay, let me start that way. I'll flip my presentation around. I think you are dead right when you have the sense that this is a harmless error situation. It's a lot easier for us to rule that way. We can just assume without deciding that there was error. Nevertheless, in view of all the other testimony, it's clear that if there were error, it's beyond reasonable doubt. That's kind of the way that I would conservatively rule on it, if it's easier to do it harmless error rather than to get into, I think it's a close question as to whether there's error or not. And if we don't have to go there, why spend all this time fighting about it? I get that. So I think it's easier to talk about harmless error if it can be affirmed on that basis. Well, let me start with that then. Maybe you ought to end with that too. Okay, that's fine. I'm at your disposal. First, let's start with what the net effect of these statements were. I think everybody has indicated they understand this, but there was a complete statement to Detective Kranich that was properly Mirandized and nobody ever challenged it. And that almost exactly mirrored the Gill's statement that was challenged. So in other words, Mustafa told Kranich, I was in my house, this group of people came by, they were smoking dope, they left, I hear shots, I hear a scream, people come back and they tie me up and they're talking about why did you shoot the girl and then they run off. So essentially an exculpatory statement. The Gill statement that is challenged is essentially the same thing, except for one phrase where Gill is told by Mustafa, well, when they were planning this out, I added some insight. So just the added insight, whatever that means, is what was added to the unchallenged Miranda statement. So that's the thing that was added that you have to decide is or is not harmless error. So just to look at the physical evidence, for example, in this case. Is that pretty much it? That's it. What does added insight mean? So we have physical evidence. The keys to the caprice where Shayla was shot were in Mustafa's house, found by the police. The murder weapon with Shayla Johnson's blood and DNA on the muzzle were found in the garage in the backyard of Mustafa's house. A shirt which had Shayla Johnson's blood and DNA and Brown's DNA and Mustafa's DNA was found laying outside the house in his backyard. Shayla Johnson's blood and DNA were found in Mustafa's sink. And there was no evidence that Shayla Johnson was ever in the house, so it's not like she would pay a social call or something like that. So that, oh, and then the other weapons that the witnesses linked to the crime were found behind Mustafa's house. So essentially all of them were. So then you link that to, I'll say three, but it was really four witnesses that testified against Mustafa. You've got Brown and Klein who were block burners and cut deals. They said Mustafa was the originator of this plan. When we got called over to do a lick, it was Mustafa and Wally talking about the house is over there, Shayla Johnson will know where this dope is, and so it's Mustafa and Wally who are laying it out for everybody else. Another witness. Who are those witnesses now who said that? Brown and Klein. Now my opponents make the point that the jury acquitted on a couple of counts, but it wasn't what Brown and Klein testified about. The beating of Mr. Beachler really hinged on the testimony of one man, D'Andre Lucky. So you had D'Andre Lucky saying what happened. He and some other people did this to Mr. Beachler, and there was Crenshaw's DNA found outside, but the jury acquitted on the substantive counts for that. So they're correct that the jury just didn't take all the witnesses' testimony at face value, but there's nothing to indicate that Brown and Klein were at all disbelieved by the jury. The deals that were cut, were they cut before the testimony and then they pleaded afterward, or how did that work? No, they pled prior to the trial, and Klein, I think, pled first and got 20 years, an agreed sentence of 20 years. Lanier also did, and then Brown waited a little while before or after that, but still before trial and pled to a 25-year sentence. So they all pleaded guilty and were sentenced before they testified at trial. I think that's true. They for sure pled guilty, and it was clear that the plea agreements were for 20 and 25. One year. The only reason I hesitate is I'm not sure they all had been sentenced, but I think that's true. Okay. All right, so you have those two, but then you've got Lanier, who also said the same thing. So he's a third cooperator who was in on the plan, saying that Mustafa was the man who originated this plan, and even Shayla Johnson's brother, who is not implicated in any of this, said, well, I wasn't there for the planning, but I was there when my sister Shayla showed Mustafa her cell phone photo of these mature, valuable marijuana plants, and he was quite interested, where are they and whose are they? And so you've got all that. Where were they, by the way? Well, we never found out. Apparently they were somewhere outside of Lansing in some rural area, but that's the tragedy of this is it was such a stupid plan. It was never going to work. So you've got that whole mountain of evidence. I say Mustafa is fortunate that the cooperating witnesses did testify because they at least confirmed that he didn't go over there, because I think if they hadn't said that, there was enough for the jury to assume that he was the trigger man. And we don't even get to his statement. Now, I will admit that I mentioned his statement in closing argument. We wanted the statement. But if you read that part of my closing argument, it was only as like a last point to the jury. If you don't believe any of the witnesses or any of the DNA evidence or anything like that, look at what Mustafa said. I added insight. And that, we said, is aiding and abetting or assisting. So if you want to go off on harmless beyond a reasonable doubt, that's definitely probably the strongest part of this Miranda issue. As a practitioner and as somebody that's in front of the district court who tries to make sense of these Supreme Court and Sixth Circuit rules, this is an opportunity to try and do. Pardon me? It's hard for us to do. I know. See, we don't usually get into them, but we don't have to. That's fine. It would be interesting. I'm sure you would like to get some more good law on your side. Well, only if it's going to be. You don't want us to give you some bad law. Right. So maybe I'll leave that issue alone then, unless you have questions about that. Let me just touch briefly about the other issues that have been raised during oral arguments here today. The argument that there are multiple conspiracies, not one conspiracy, is a plain error situation because it's not an issue that was litigated. There's plenty of evidence under any standard for you to affirm those points because you have, again, Brown and Klein, who were the block burners, testifying, saying this is what we do. We rob people for drugs, and that's how we make our money. And we rely on each other to do these licks when they come up. Now, we don't get everybody together to do every lick, but we know that each other are available. They have the same pool of guns. If you read the record, you can see that Jones was robbed using a long gun that turned out to be used to kill Shayla Johnson. So that was a gang house gun, I guess, if you want to look at it that way. The AK-47, that was the other long gun used to kill Shayla Johnson or at least brought over to her house. Dion Lanier said, I saw that Mustafa's house months earlier. It's available to people. They use these. The guns that they robbed Tyrese Jones of, Brown and Klein and Lewis, end up being used by Brown, Klein, and Crenshaw in a shootout with a rival gang, and they end up throwing them out during a police chase. So they had a stash of weapons that they would go to, and that shows that they all cooperate with each other. Weren't these guys felons to begin with? No. Lewis was. These kids are all 18, barely. They probably weren't felons. No. Lewis is about 35. His son, Lewis Jr., was 13, so he went off to state court as a probate case. Klein was two days or three days past his 18th birthday, so he was barely an adult. So they didn't really have adult felonies. And then finally, Crenshaw is on the video that was shown to the jury about how happy they were that Brown got released when the state case fell apart, and they're all celebrating how the block burners don't fold, and they're all loyal to each other. So that's, again, more evidence that they all hang together. And finally, the defense had the opportunity to present this multiple conspiracy theory to the jury, and they didn't ask for the jury instruction, which is a Sixth Circuit pattern instruction. I'm not going to add too much about Mr. Lewis's conflict claim other than to point out that I don't see the cases that we've cited in our brief have been overruled. It's still the law, as far as I can tell, in the circuit that if the former client, that's the witness, waives the privilege, then the privilege is waived. It is the client's privilege. It's not the lawyer's privilege. So for Mr. O'Hara to say he's uncomfortable doing his utmost to cross-examine Mr. Kasel, it's not appropriate, I don't think, for him to say that. It occurred to me that there's a very common situation that you might have run into before that bears that out. For example, when somebody raises a 2255 ineffective assistance of counsel claim, the first thing often the district judge does is say to the trial lawyer, okay, the defendant is waiving the attorney-client privilege because he's claiming that you were ineffective. Tell us what happened. What's your side of the story? And thereby, the privilege is waived, and it would be unusual. I've never seen it, and I think improper for a lawyer in that circumstance to say, well, I just feel uncomfortable telling you. I'm not going to tell you. Likewise here, once O'Hara had the waiver by his former client, there was no reason for him not to fully cross-examine Kasel. I know there's a second. The basic submission is he didn't have anything to ask. He covered his prior felonies and how the things that, you know. And I think it is worth noting that Kasel is a former client. This is a client that O'Hara hadn't represented for two-and-a-half to three years. His sentence was over. His case was over. You know, the Second Circuit case that my opponent points out says it's a closer question when you have two current clients, then that's a more problematic situation. But that's not the situation here. Finally, let me just comment briefly about the Batson issue. You are correct that Mr. Calvert stated during jury selection some very troublesome remarks. You know, the first thing he was asked about whether he could be fair and impartial, or the first thing he said was, I think I won't be able to judge it justly like you were saying, and that's at page 2360. So that's about as bald and clear a statement as a trial practitioner is going to get about a hostile juror. We move for dismissal of Mr. Calvert for cause. The judge, I think, he said it was a close cause to cause, but he felt that, you know, through skillful questioning and maneuvering, he had been rehabilitated for cause purposes, but the bell had been rung by then. I mean, it would be malpractice for me not to try and exclude a juror like that, and it has nothing to do with race. He could have been any race and said something like that. I mean, he didn't say it's because I'm a black person I feel this way. So, you know, just the facts on the record right in front of everybody was more than enough, I think, to establish a race-neutral basis under VATS, and the judge, as we've noted in our brief, the trial judge has a lot of discretion in situations like this. Certainly I think that this falls well within that discretion, and to turn it around if the rule were the reverse, if I'm stuck with a juror that says that, but somehow says enough to survive a four-cause challenge, but I have to keep that person on, that means that there's no such thing as a race-neutral reason because then I'm stuck with my opponent's theory that, well, once he's explained it sufficiently to make it look okay, then I'm stuck with this person, and that's just not the law as far as I'm concerned. And overriding all that is the fact that there was no other pattern of us trying to exclude minorities from the jury. I mean, we let whatever minorities were on and called on unless they had some problem about being fair and impartial, and nobody else besides Mr. Calvert said anything like this. So unless you've got questions about other issues, I'm going to rely on my brief. Thank you very much for the opportunity. Thank you. All right. Mr. Burns, I think you've got two minutes rebuttal. Did anybody else reserve? You did? Okay. I just didn't write it down. Okay. What, two minutes, or what? All right. Okay. Let's go. I would just like to make two quick points, Your Honor, first in relation to what the government said about the variance issue. The government stated that there was a cache or a pool of guns, and that is evidence that these members were part of a group that carried out these crimes. If you look to the record, although Mr. Brown does state that these are block burner guns, once he is pushed further, he notes that it's only him and Lewis Sr., who is not a member of this block burner group. This is plain error? This is plain error, Your Honor. And that brings me to my second point. In 2008, this court decided U.S. v. Swofford, and in that case the variance issue was raised for the first time on appeal as well. And it involved a conspiracy that was structurally very similar to this one, and the Swofford, the appellant in that case, suffered a very similar level of prejudice to the type of prejudice that Mr. Crenshaw suffered in this case. Swofford involved a methamphetamine production ring. Was this a plain error case? This was a plain error case, Your Honor. And I believe you wrote the opinion, and it was found that I've only written about 10,000. Well, in that case, Your Honor, the court found that a variance had occurred, even under the plain error standard. And if you look to the two conspiracies, the one in Swofford and the one in this case, they're very similar. In Swofford, there was a single individual selling items that are used to produce methamphetamine to a number of different buyers, and the government tried to connect all of those buyers and say that it was a real conspiracy. But the court found that there was no common goal between the buyers. And because there was no common goal, the evidence of a whole conspiracy would prejudice Mr. Swofford by spilling over onto him and making him appear more culpable. In this case, although there is a group in the middle, and individual members are involved in each act, the masterminds of the case, I see my time is running out, may I finish my point? However, the mastermind of each act alleged to be part of this conspiracy is not a member of a BlockBurner group, and the goal is independent in each case. For this reason, we ask that Count 1 be reversed and remanded to district court for retrial. Thank you. All right. Thank you, Mr. Byrne, and you've represented your client well. Thank you for your service. Mr. Rossman? Thank you, Your Honor. I'd like to come back to the harmless error issue and talk about what the case against Mustafa would have looked like without his statements to Detective Gill after he said, man, I want to talk to my lawyer. Prior to that, his statement to Detective Kranich, and he stuck with this with Detective Gill, was these men came to my back door. I opened the door to let the dog out. I thought it was a raccoon or something like that. And they stuck a gun in my face, barged in my house, tied me up in the basement, and, you know, so if you find burned clothes or DNA or whatever, that's the explanation. Now, maybe that's not a very good story. Maybe a jury wouldn't believe that, but it's certainly consistent with the physical evidence. It would explain all the physical evidence. And so Mustafa at that point would have a very strong defense that a jury could believe. And then we would be left with the testimony. Let's say that he would have a defense. I'm not sure how strong that is, but you go ahead. I mean, there was so much physical evidence found around the house and in the house. And it is his brother that's on trial and so forth and so on. Right, but again, we have very limited harmless error review. It has to be harmless beyond a reasonable doubt, and I don't think that we can say that. Now, let's talk about the facts that were developed after he said, man, I want to talk to my lawyer. It was more than I just gave a little insight. Mustafa told Detective Gill after he said, man, I want a lawyer, he said that he introduced Dion to the others to do the armed robbery. He said he knew the men had guns. He knew they were going to do a robbery for marijuana, and he knew they were going to get a lot of money. He also identified the shooter. He said Chuck shot her. He denied that he knew who Chuck was. He said, I don't know who Chuck is, but he said Chuck shot her. That's the one who shot her. So all of these are highly, highly inculpatory statements that he said only after, man, I want to talk to my lawyer, and his assertion of his marijuana right was ignored. All right. Any further questions? Thank you, Mr. Brown. Thank you. No, I. Thank you, Your Honor. I'll be very brief. Two points. Now, regarding this Bruton issue, the theory of Bruton is that you redact a statement and the statement can only be used against the defendant who made the statements. What my colleague here hasn't mentioned to you, that in closing argument, he argued to the jury after summarizing the testimony of the three cooperating defendants, he then referred to Mustafa's statement, and at page ID 4639, he states that what Mustafa told the detective corroborates what you heard from the three cooperating witnesses. And I think that tends to undermine this harmless error argument because when the government is urging the jury to use Mustafa's statement as substantive evidence against the other defendants, that undermines Bruton completely. With regard to the counsel issue, I would ask that the court look at the Second Circuit case, U.S. v. Oberoi, which did deal with the former client, present client situation, and the Second Circuit did accept the argument that if counsel says he cannot cross-examine the former client effectively, that he should be allowed to withdraw from the case. All right. Thank you, Mr. Feller. Mr. Graham? Just a couple of factual points. Judge Doctor, you asked the question, were the cooperators, did they plead, and were they sentenced before trial? I respectfully disagree with Mr. Verhey. They had binding plea agreements, so everyone knew what they were going to get if they carried through. They did plead before, but they were sentenced after, and so they had to come through consistent with what the government expected of them. Judge Merritt, you asked a question about where was the marijuana. Shayla Johnson's boyfriend, who supposedly had all the marijuana, actually came forward and testified. There was no marijuana, again, tragically. There was no marijuana. Where did the photograph come from? I don't think that was ever established. Nobody knows. In regard to the Bruton question, It's not surprising that he showed up and said, no, there's not any marijuana, and there never was any. Talk about self-interest on the stand when you sworn. He was an addict and kind of a pathetic soul. In regard to the Bruton point, there was a comment made that the redaction actually made it less likely that the jury would think that Mustafa was talking about the other defendants, and once the three cooperators and Anthony Johnson testified, it was crystal clear who they were talking about. On the question of the Batson issue and what was said by Juror 61, that he would have trouble being fair, this Court sees the records. We see that as initial statements all the time, all the time by all sorts of people, usually people who don't want to serve, and they get rehabilitated and they're good to go. So I don't think he's different than any of them. Thank you. Thank you, Mr. Graham. The case will be submitted. I do want to thank Attorneys Rossman, Graham, and Belli for your service. The Court notes that you accepted the appointments under the Criminal Justice Act, and thank you for your service in this case.